Filed 4/18/25  P. v. Patel CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>MAYA PATEL,<br><br>　　　Defendant and Appellant. | B335952<br><br>(Los Angeles County Super. Ct. No. MA084506) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Emily J. Cole, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Stephanie C. Brenan and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Maya Patel appeals from her convictions for child abuse, driving while intoxicated, and resisting a peace officer, arguing that the trial court erred when it refused to instruct the jury on the affirmative defense of necessity. We affirm.

# II. FACTUAL BACKGROUND

## A. *Prosecution's Case*

On the night of January 1, 2023, Shana Ruder was awakened by her dogs barking at "a lot of commotion" outside her Lumber Street residence in Lancaster, including people yelling and a car horn honking. She heard a combination of male and female voices and "excessive" honking, like someone "laying on the horn" at least 10 times.

Ruder went outside and saw a Prius driving in and out of her next-door neighbors' driveway "aggressively." Although her neighbors—defendant and her domestic partner Emmanuel Erby—had argued before, Ruder described this scene as "way different" and "out of the ordinary."[1] She called 911 and reported that her "'neighbor [was] trying to run over [Erby] with a car out in the middle of the street.'"

Ruder observed Erby walking in the middle of his driveway as defendant drove a car toward him, "going fast", causing him to

---

[1] Prior to the incident, Ruder heard defendant and Erby argue a lot and she saw him be physically violent with her at least twice before.

jump out of the way.[2]  The car came "pretty close" to Erby, and Ruder believed that it would have hit him if he had not jumped out of the way.  The car then went up on the front lawn, where Erby picked up a brick and threw it at the windshield.  Defendant backed up, but continued to go in and out of the driveway, and it appeared to Ruder that defendant was "actively attempting to hit [Erby]" with the car.

On January 1, 2023, at approximately 8:30 p.m., Los Angeles County Sheriff's Department Deputy Megan Holcomb, along with four other deputies, responded to a report of domestic violence at defendant's residence on Lumber Street.  When Deputy Holcomb arrived at the scene, she observed defendant standing in the driveway outside a vehicle in which defendant's two young children were sitting and yelling.[3]  They were not restrained by a seatbelt or car seat and the only child safety car seat in the vehicle was not buckled in.  The deputies gave defendant commands to walk down the driveway toward them, but she refused and instead entered the car's rear passenger compartment with her children and then sat on top of them.

Deputies approached the vehicle and asked defendant to step out and speak with them.  But she "kept screaming that she did not want [the deputies] to . . . take her kids and that she was not getting out of the vehicle."  Deputy Holcomb estimated that

_____

[2]     During Ruder's testimony, the prosecution played a residential surveillance camera video of the incident, and she confirmed that it accurately depicted portions of the incident she observed that night.

[3]     During her investigation, Deputy Holcomb determined that the children were defendant's two daughters, ages seven and two years old.

she asked defendant to exit the vehicle at least 20 times, but she refused to comply. Defendant's children were screaming and crying as deputies tried to convince her to exit the vehicle. The deputy could smell the odor of alcohol coming from defendant who was "very obviously drunk."[4]

Based on defendant's movements inside the vehicle, including an attempt to reach for the ignition, the deputies decided to remove her. As they pulled defendant from the vehicle, she dragged the child safety car seat out with her. Outside the vehicle, Deputy Holcomb struggled with defendant, who refused to put her hands behind her back while the deputy attempted to handcuff her.

During her investigation, Deputy Holcomb obtained security camera video of the incident from a residence directly across the street. The beginning of the video showed defendant's car leaving the scene for approximately 30 seconds, but returning. The car then moved up the driveway directly toward Erby, reversed, and repeated the maneuver toward Erby two more times. The third time the car moved up the driveway toward Erby, he retreated backwards.

After the car reversed and then moved up the driveway toward Erby a fourth time, he ran from the driveway to the lawn. When the car followed him, he appeared to pick up something and throw it at the vehicle, damaging the windshield.

In total, defendant drove up the driveway toward Erby at least seven times before reversing for a final time and leaving the view of the surveillance camera. But, a short time later,

---

[4]     Defendant stipulated that on the night of the incident, she drove a motor vehicle while under the influence of alcohol with a blood alcohol concentration of .08 percent or greater.

4

defendant returned to the driveway as deputies responded to the scene.

B.    *Defendant's Testimony*

Defendant began dating Erby in 2009 and had her two daughters with him. By 2010, the relationship became abusive and included Erby pushing, grabbing, and striking her.[5] In addition, he once knocked defendant's tooth out, placed a pillow over her face on another occasion, threw things at her, and routinely destroyed her clothes and belongings.

On January 1, 2023, after returning from their two-year-old daughter's birthday celebration at a party venue, defendant and Erby, who began drinking earlier in the day, engaged in an argument after he searched through her phone and discovered she had been talking to another man. Erby became aggressive, called defendant names, and punched a hole in the wall. He then started to push and grab defendant, leaving bruise marks and causing her to fear for her life.

Defendant ran outside with her children, entered the vehicle with them, locked the doors, and waited. After "[a] few minutes", Erby came out and threw a remote control, a Patron bottle, and a "dollhouse" at the vehicle, breaking the windshield. Defendant, who was scared of dying, began to honk the horn at Erby attempting "to scare him[ and t]o make him stop."

When the honking failed to deter Erby, defendant began accelerating forward, and then reversing the vehicle, in an effort to make him stop; she had no intention of hitting him. But Erby

---

[5]    According to defendant, Erby was six-feet, five-inches tall and weighed 280 pounds and she was four-feet, nine-inches tall.

continued to throw heavier objects at the windshield, including heavy decorative rocks, and finally succeeded in shattering the windshield.

Defendant did not intend to drive that night because she had been drinking. She was unsure whether she placed her two-year old in a properly restrained child safety car seat or whether she fastened her seven-year old's seat belt.

Defendant admitted driving away from the house and going to the end of the road near the intersection of 21st Street West and Lumber Street where she "just [hid] there on that street." She claimed that she did not call anyone at that point because she did not have a phone.

When defendant saw police lights, however, she drove home assuming that they were coming to the residence to help her, not arrest her. Once home, she exited the vehicle without her children, went into the house, and "grab[bed personal] items", including her identification and phone. When she turned around, she saw police pointing their guns at her and heard them yelling at her. But she ignored their commands to walk toward them and instead returned to the vehicle because she was scared and wanted to protect her children. While in the vehicle, defendant refused to tell the deputies what happened to her windshield because she was protecting Erby and afraid that, if she told them, Erby would hurt her. And, she refused to exit the vehicle when requested by the deputies because she did not want to be separated from her children or have them taken away from her.

# III. PROCEDURAL BACKGROUND

In an amended information, the Los Angeles County District Attorney charged defendant, in counts 1 and 2, with child abuse under circumstances likely to cause great bodily injury or death in violation of Penal Code section 273a, subdivision (a)[6]; in count 3, with assault with a deadly weapon in violation of section 245, subdivision (a)(1); in count 6, with driving under the influence in violation of Vehicle Code section 23152, subdivision (a); in count 7, with driving with a blood alcohol content of .08 percent or greater in violation of Vehicle Code section 23152, subdivision (b); and in counts 8 and 9, with resisting, delaying, or obstructing an officer in violation of section 148, subdivision (a)(1).

The jury found defendant guilty on counts 1, 2, and 6 through 9, but deadlocked on count 3, resulting in a mistrial on that count.

At the sentencing hearing, after the prosecution amended the information to add count 10—assault by means of force likely to cause great bodily injury in violation of section 245, subdivision (a)(4)—defendant pleaded no contest to that offense and the trial court accepted the plea, convicted defendant on count 10, and dismissed count 3. The court then suspended imposition of sentence on the counts upon which defendant had been found guilty and placed her on probation for four years with 180 days in county jail.

Defendant filed a timely notice of appeal.

---

[6]    All further statutory references are to the Penal Code, unless otherwise indicated.

# IV.   DISCUSSION

Defendant contends that the trial court erred by refusing her request to instruct the jury on the defense of necessity, thus violating her federal due process rights.

## A.   *Duty to Instruct Upon Request*

"In general, a trial court must give a requested jury instruction if there is substantial evidence in the record supporting such an instruction.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1008 . . . .)  'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . ."'  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  'On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence—evidence that, if believed by a rational jury, would have raised a reasonable doubt as to' an element of the crime in question.  (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)"  (*People v. Mitchell* (2019) 7 Cal.5th 561, 583.)

"Whether or not a given set of facts provides the necessary support for drawing a particular inference is a question of law.  Before instructing a jury that it may draw the inference, the trial court must determine that there is evidence on the record which, if believed, will support it.  (*People v. Hannon* (1977) 19 Cal.3d 588, 597–598.)"  (*People v. Romo* (1990) 220 Cal.App.3d 514, 519.)

B.    *Background*

During the prosecution's case, the trial court and counsel discussed jury instructions, including one based on the necessity defense.  The court acknowledged that defense counsel had requested the instruction and that it had tentatively included an instruction on that defense in the package of instructions it intended to give.[7]  The court noted, however, that the evidence up to that point did not warrant the instruction and advised that it would wait until it heard defendant's evidence before making a final decision on whether to give it.

After the close of evidence, the trial court returned to the necessity defense instruction and decided it was not warranted, reasoning as follows:  "I have to decide whether or not there's been substantial evidence for this instruction, and I do not find that there is substantial evidence for this instruction; so I did take it out of the final instructions.  I put it in so that we could have this discussion, and I wanted to wait until the defendant

---

[7]    The CALCRIM instruction on the defense of necessity, No. 3403, reads:  "The defendant is not guilty of ____ <*insert crime[s]*> if (he/she) acted because of legal necessity.  [¶]  In order to establish this defense, the defendant must prove that:  [¶] 1. (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/ [or] someone else);  [¶] 2. (He/She) had no adequate legal alternative;  [¶]  3. The defendant's acts did not create a greater danger than the one avoided;  [¶]  4. When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil;  [¶]  5. A reasonable person would also have believed that the act was necessary under the circumstances;  [¶] AND  [¶]  6. The defendant did not substantially contribute to the emergency."  (CALCRIM No. 3403.)

9

testified to see if there was substantial evidence entered in, and I have found that there is not. I just want [defense counsel] to have the opportunity to object." At that point, defense counsel objected.

C.    *Analysis*

Defendant argues that her evidence supported a reasonable inference that (1) faced with the imminent threat of physical injury by Erby that night, she had no legal alternative but to place her two-year-old and seven-year-old daughters in her car and then to drive with them—unrestrained—while intoxicated, in violation of section 273a, subdivision (a) (child abuse under circumstances likely to cause great bodily injury or death) and Vehicle Code section 23152, subdivisions (a) and (b) (driving under the influence and driving with a blood alcohol content of .08 or greater); and (2) based on the same threat of physical harm, she had no alternative upon returning home from driving, and seeing at least five deputies at her home, but to refuse to obey their commands or answer their questions, in violation of section 148, subdivision (a)(1) (resisting, delaying, or obstruction a peace officer).

The necessity defense on which defendant sought an instruction "'is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile.' [Citation.] 'By definition, the necessity defense is founded upon public policy and provides a justification distinct from the elements required to prove the crime.' [Citation.] 'Necessity does

10

not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime.' [Citation.]

"'To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that [she] violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which [she] did not substantially contribute to the emergency.' [Citation.]" (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1164–1165, fn. omitted (*Verlinde*); see also CALCRIM No. 3403.)

We will assume, for the sake of argument, that defendant's evidence supported a reasonable inference that Erby's conduct that night, which included physical abuse of defendant before the driving incident and acts of violence against defendant and her children during it, constituted an imminent threat of physical harm and that defendant acted to prevent such harm. We nevertheless conclude that there was insufficient evidence to support one or more of the other elements of her necessity defense. (See *Verlinde, supra*, 100 Cal.App.4th at p. 1165 [refusal to give necessity instruction upheld when defendant failed to establish fourth and fifth elements of the defense].)

As to the child abuse and driving under the influence convictions, defendant's evidence did not support the fifth element of her defense—that a reasonable person would also have believed that her actions in driving at 8:30 p.m. with her children unrestrained and while she was intoxicated were

11

necessary under the circumstances. Defendant admitted that when she left the house with her children, she sat in the car for "a few minutes" before Erby came out of the house and began throwing objects at the car. That was enough time to have sought refuge at a neighbor's home or to have borrowed a neighbor's phone and called law enforcement. Defendant also admitted that after finding a place to hide, at the end of her road, she drove back to the home, again with the children unrestrained, when she saw police lights. A reasonable person under those circumstances would not have operated a vehicle with her children inside, knowing she was too intoxicated to properly restrain or drive with them.

As to the delaying, resisting, or obstructing the deputies' offenses, defendant admitted once she arrived back home with the children in the car, she (1) believed the deputies were on their way to the home to assist her; (2) did not see Erby in front of the home; (3) she voluntarily entered the home to retrieve personal belongings; and (4) she saw deputies arrive at the home with their guns drawn. That evidence did not support elements four or five of her proffered defense—that she actually believed her conduct in ignoring the deputies' repeated demands to walk toward them and to exit the vehicle were necessary to prevent further physical harm by Erby or that a reasonable person would have held such a belief. By the time she committed the acts underlying her resisting convictions, defendant knew or should have known that Erby no longer posed any threat to her or her children. Thus, no rational juror could have found that she actually believed her conduct in resisting and obstructing deputies was necessary to prevent harm from Erby or that a reasonable person could have held that belief.

12

Accordingly, we conclude the trial court did not err in refusing to instruct the jury on the necessity defense.[8]

## V.   DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

HOFFSTADT, P. J.

BAKER, J.

---

[8]   For similar reasons, we conclude that the trial court did not violate defendant's due process right to present a complete defense as the necessity instruction was not supported by substantial evidence.  (See *People v. Verdugo* (2010) 50 Cal.4th 263, 294.)